Maylon B. CLINKSCALES t/a
Clinkscales Oil Company,
Plaintiff-Appellant,

v.

CHEVRON U.S.A., INC.,
Defendant-Appellee.

No. 86–8753.

United States Court of Appeals,
Eleventh Circuit.

Nov. 13, 1987.

William L. Taylor, Southmayd Powell & Taylor, Washington, D.C., for plaintiff-appellant.

R. Matthew Martin, Hansell & Post, Atlanta, Ga., for defendant-appellee.

Before HILL and KRAVITCH, Circuit Judges, and TUTTLE, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

The Petroleum Marketing Practices Act (PMPA), 15 U.S.C. §§ 2801–41, was enacted by Congress in 1978 to establish "minimum Federal standards governing the termination and nonrenewal of franchise relationships for the sale of motor fuel by the franchiser or supplier of such fuel." S.Rep. No. 95–731, 95th Cong., 2d Sess. 1, *reprinted in* 1978 U.S.Code Cong. & Admin.News 873. The district court conclud-ed that appellee Chevron U.S.A., Inc.'s (Chevron) termination of its franchise relationship with appellant Maylon B. Clinkscales (Clinkscales), trading as Clinkscales Oil Company, complied with the requirements of the PMPA. The court therefore granted summary judgment for Chevron. We affirm.

## I. BACKGROUND

Clinkscales was engaged in the business of wholesale and retail sales [1] of petroleum products in the Athens, Georgia area. From 1946 to 1984, Clinkscales purchased and accepted on consignment various Chevron petroleum products and entered into supply and consignment agreements with Chevron. The most recent agreement between the parties was a January 1984 "Branded Jobber Petroleum Products Agreement" (Jobber Agreement) which gave Clinkscales exclusive distributorship rights for approximately thirty-five "branded" Chevron dealers in the Athens area.

On June 27, 1984, Chevron notified Clinkscales that the Jobber Agreement would terminate in ninety days. The notice stated five grounds [2] for the termination: (1) delivery of non-Chevron gasoline for resale under Chevron's trademark at

---

1. Clinkscales purchased or took on consignment Chevron petroleum products for retail sales from 1946 to 1984. In 1981, Clinkscales expanded its business to include wholesale distribution.

2. Subsection 14(b) of the Jobber Agreement provided that Chevron may terminate the agreement if any of 10 specified events occurred:

(1) Jobber by act or omission breaches or defaults on any covenant, condition or other provision of this agreement, which breach or default can be cured, and Jobber fails to cure such breach or default within ten (10) days after such written notice from Chevron which shall specify such breach or default; or

(2) Jobber by act or omission breaches or defaults on any covenant, condition or other provision of this agreement, which breach or default cannot be cured, or in the event of any breach or default by Jobber after notice of two previous breaches or defaults of any kind has been given hereunder, regardless of Jobber's curing of such previous breaches or defaults; or

(3) Jobber fails to exert good faith efforts to carry out the provisions of this agreement following written notice to Jobber from Chevron of such failure and a reasonable opportunity to exert good faith efforts to carry out such provisions; or

(4) Jobber fails to pay to Chevron in a timely manner when due all sums to which Chevron is legally entitled; or

(5) Jobber knowingly fails to comply with Federal, state or local laws and regulations relevant to Jobber's performance of this agreement; or

(6) Willful adulteration, commingling, mislabeling or misbranding of motor fuels or other violations by Jobber of trademarks utilized by Chevron; or

(7) Unlawful, fraudulent or deceptive acts or practices or criminal misconduct by Jobber relevant to Jobber's performance of this agreement; or

(8) Jobber knowingly induces the breach by a third party of a contract between Chevron and the third party; or

(9) Conviction of Jobber of any felony involving moral turpitude; or

(10) Jobber's death if Jobber is an individual (subject to any valid requirements of any applicable statute).

branded Chevron service stations; (2) unauthorized use of Chevron's trademarks and insignia by placing Chevron's insignia on gasoline pumps at an unauthorized dealership and encouraging this dealership to accept Chevron credit cards without Chevron's approval; (3) sale of Chevron gasoline to Chevron direct-supply contract dealers; [3] (4) failure to cure monetary defaults in the form of three returned checks in the aggregate amount of $83,595.60; and (5) failure to exert good faith efforts to carry out the Jobber Agreement.

In response to the notice of termination, Clinkscales brought this action for damages and injunctive relief. The complaint alleged that Chevron's termination of the Jobber Agreement violated the PMPA, and that Chevron's actions constituted an unlawful horizontal restraint of trade in violation of the Sherman Act, 15 U.S.C. §§ 1–7. Chevron answered and counterclaimed for damages and permanent injunctive relief against further trademark violations.

The parties agreed to a temporary restraining order enjoining Chevron from preventing Clinkscales from using Chevron trademarks or hindering Clinkscales's ability to purchase Chevron products. After evidentiary hearings,[4] the court denied appellant's motion for a preliminary injunction, ruling that Clinkscales's failure to cure the more than $50,000 in returned checks constituted cause for termination under the PMPA.

Following a discovery conference, Clinkscales filed a stipulation of facts, a motion for summary judgment, and a memorandum of points and authorities in support of his motion for summary judgment. Clinkscales contended that he complied with all of Chevron's demands with regards to curing the monetary default and that Chevron agents had granted Clinkscales a temporary credit extension at the time Clinkscales received the notice of termination.

Moreover, Clinkscales contended that terminating his franchise on the basis of the alleged violations was not "reasonable," and therefore not permissible under the PMPA, because of Chevron's course of dealings with him.

Chevron also moved for summary judgment and filed a brief in support of its motion and in response to appellant's motion for summary judgment. Clinkscales moved for judgment by default, alleging that Chevron's response to Clinkscales's motion for summary judgment was untimely under the local rules. Appellant filed a brief "in reply to defendant's response to plaintiff's motion for summary judgment and in response to defendant's brief in support of motion for summary judgment." Chevron responded to the motion for default judgment and filed a reply to appellant's response to Chevron's motion for summary judgment including a supplemental affidavit in support of Chevron's motion for summary judgment.

Approximately six months after Chevron's reply to appellant's response to Chevron's motion for summary judgment was filed, Clinkscales moved for leave to file a surrebuttal brief. Clinkscales alleged that "inadvertence by plaintiff's counsel" had caused a delay in filing but that good cause existed for acceptance of the surrebuttal brief and accompanying affidavit because Chevron's reply brief and supplemental affidavit raised "a number of unfounded factual assertions and/or legal contentions" to which Clinkscales had not had an opportunity to respond.

The district court entered orders: denying appellant's motion for default judgment; denying appellant's motion for leave to file a surrebuttal brief; denying appellant's motion for summary judgment; and granting appellee's motion for summary judgment on both counts of appellant's

---

**3.** Direct-supply contract dealers may purchase non-Chevron gasoline from any source. Any Chevron gasoline purchased by these dealers must, however, be purchased directly from Chevron. Thus, Chevron alleged that Clinkscales had knowingly induced third parties to breach their contracts with Chevron.

**4.** Although a court reporter was present at the preliminary injunctive hearings, the proceedings were not transcribed and made part of the written record of the case until after the district judge granted Chevron's motion for summary judgment.

complaint. Appellant noticed this appeal challenging only the district court's grant of summary judgment for appellee on the PMPA claims [5] and the court's denial of appellant's motion for leave to file a surrebuttal brief.

## II. DENIAL OF MOTION FOR LEAVE TO FILE SURREBUTTAL BRIEF

Rule 3(b) of the local rules for the United States District Court for the Middle District of Georgia grants ten days after receipt of an adverse motion for summary judgment for the party to file a response, brief, or affidavits. At least where the adverse party is not a pro se litigant,[6] requiring conformity with this local rule is consistent with the requirements of Fed.R. Civ.P. 56(c). *See Howell v. Tanner*, 650 F.2d 610, 614 (5th Cir. Unit B July 1981), *cert. denied*, 456 U.S. 918, 102 S.Ct. 1775, 72 L.Ed.2d 178 (1982);[7] *Kibort v. Hampton*, 538 F.2d 90, 91 & n. 1 (5th Cir.1976) (per curiam).

Appellant contends, however, that Chevron raised new legal arguments and new evidence in its reply brief and supplemental affidavit. He claims, therefore, that he could not have responded to these new matters within the ten day response period dictated by the local rules. We need not decide whether new evidence appended to a movant's reply brief[8] might necessitate granting the nonmovant leave to file a surrebuttal brief or supplemental affidavits because, even if appellee's reply brief and affidavit did present new evidence,[9] Clinkscales has failed to demonstrate any adequate excuse for delaying six months after Chevron's reply brief was filed to seek leave to file the surrebuttal brief and the supplemental affidavit.

Absent an affirmative showing by the non-moving party of excusable neglect according to Fed.R.Civ.P. 6(b),[10] a court does not abuse its discretion in refusing to accept out-of-time affidavits. *Farina v. Mission Inv. Trust*, 615 F.2d 1068, 1076 (5th Cir.1980); *Beaufort Concrete Co. v. Atlantic States Constr. Co.*, 352 F.2d 460 (5th Cir.1965), *cert. denied*, 384 U.S. 1004, 86 S.Ct. 1908, 16 L.Ed.2d 1018 (1966). Where, as here, the local rules do not provide for surrebuttal briefs, we conclude that the requirements of Fed.R.Civ.P. 6(b) also apply to the court's decision as to whether to grant a non-movant leave to file a surrebuttal brief. As such, the district court may in its discretion allow a surrebuttal brief where the non-movant's failure to fully respond to the motion in its original response was due to excusable neglect.

The district court's denial of leave to file a surrebuttal brief and supplemental affidavit was not an abuse of discretion under the Rule 6(b) standards. Appellant's only excuse for the six-month delay after Chev-

---

**5.** Appellant does not contest the district court's entry of summary judgment for appellee on the Sherman Act claim nor the court's denial of its motion for summary judgment.

**6.** *See Moore v. Florida*, 703 F.2d 516 (11th Cir. 1983).

**7.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**8.** Rule 3(c) of the local rules for the United States District Court for the Middle District of Georgia allows moving parties to submit "any desired reply brief, argument, *or affidavits* within five days after service of respondent's response, brief, or affidavits." (emphasis added). Hence, the local rule clearly allows a movant to file a reply brief and supplemental affidavits. Clinkscales does not argue that the district court

abused its discretion in allowing the reply brief and supplemental affidavit either because they raised new evidence or because they were untimely filed under local rule 3(c).

**9.** *Cf. Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 410 (1st Cir.1985) (nonmoving party should have had opportunity to examine and reply to moving party's reply brief and supplemental affidavits containing new evidence prior to hearing and disposition of summary judgment motion).

**10.** Fed.R.Civ.P. 6(b) provides in pertinent part:
When by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion ... upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.

ron filed its reply brief in support of its motion for summary judgment was "inadvertence by plaintiff's counsel who was involved in other proceedings." It is well established, however, that "[t]he fact that counsel has a busy practice does not establish 'excusable neglect' under Rule 6(b)(2)." *McLaughlin v. City of LaGrange,* 662 F.2d 1385, 1387 (11th Cir.1981), *cert. denied,* 456 U.S. 979, 102 S.Ct. 2249, 72 L.Ed.2d 856 (1982). In light of local rules requiring the movant's reply brief and affidavits to be filed within five days after service of the nonmovant's response, appellant should have known that, even if a surrebuttal brief and additional affidavits were allowed, a delay of six months before seeking leave to file these documents was unreasonable. The district court was therefore well within its discretion in denying appellant leave to file the surrebuttal brief and the appended supplemental affidavit.

## III. THE PMPA CLAIM

### A. *Burdens of Proof*

In denying appellant's motion for summary judgment and granting summary judgment for Chevron on the PMPA claim, the district court ruled as a matter of law: "[T]he facts alleged by plaintiff and undisputed by defendant are insufficient to establish liability on the part of the defendant on any of plaintiff's claims. Plaintiff's motion for summary judgment is hereby DENIED.... Since the court has found against the plaintiff on all claims, the defendant's cross-motion for summary judgment is GRANTED." In a footnote to this conclusion, the court, citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), explained that "[m]ost of the plaintiff's claims fail due to a lack of proof.... There is no requirement that the defendant, in the case at bar, *negate* the elements of plaintiff's claim." (emphasis in original).

The district court misapplied *Celotex* to the case at bar, with the result that it allocated the burdens of proof in a manner inconsistent with the PMPA. 15 U.S.C. § 2805(c) provides:

In any action under subsection (a) of this section, the franchisee shall have the burden of proving the termination of the franchise or the nonrenewal of the franchise relationship. The franchisor shall bear the burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted under section 2802(b) or 2803 of this title....

Clinkscales met his burden of production by demonstrating that Chevron terminated the franchise agreement. The burden then shifted to Chevron to demonstrate that the termination was valid under the PMPA. The district court erred in concluding that Chevron was not required to make this showing.

The Court's opinion in *Celotex* is consistent with this application of the burden of proof for summary judgment under the PMPA. The Court in *Celotex* held that Rule 56(c) mandates the entry of summary judgment, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, *and on which that party will bear the burden of proof at trial.*" 106 S.Ct. at 2552–53 (emphasis added). Here, Clinkscales met his burden of showing that his franchise had been terminated, and the fact that he did not affirmatively show that the termination was impermissive did not entitle Chevron to summary judgment. Rather, to prevail on its own motion for summary judgment, Chevron had to demonstrate that the termination was lawful under the PMPA. We therefore review the record before the district court to determine whether, applying the correct allocation of burdens of proof, summary judgment for Chevron was proper.

### B. *Summary Judgment for Chevron*

As a preliminary matter, the parties dispute whether certain evidence was properly before the district court in ruling on the summary judgment motions. This disputed evidence consists of: (1) the supplemental affidavit of Maylon B. Clinkscales, Jr. appended to appellant's surrebuttal brief; (2) the affidavits of Maylon

Clinkscales, Sr. and Maylon Clinkscales, Jr. appended to appellant's motion for a preliminary injunction; and (3) the testimony at a hearing held prior to the court's ruling on appellant's motion for a preliminary injunction. We held above that the district court did not abuse its discretion in refusing to allow appellant to file his surrebuttal brief and the supplemental affidavit of Maylon Clinkscales, Jr. The affidavits appended to appellant's motion for a preliminary injunction were, however, part of the written record before the district judge at the time he ruled on the summary judgment motions. These affidavits were therefore properly before the district court. *See, e.g., Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir.1986).

The testimony produced at the preliminary injunction hearing was not transcribed until after the district court ruled on the summary judgment motion. We conclude that, even though the same district judge presided at both the preliminary injunction and summary judgment stages, appellant was obligated to produce a written transcript of the hearing in order to rely upon this testimony as evidence for consideration on summary judgment. Although a court ruling on a summary judgment motion may not neglect to consider documents that are filed merely because they are not singled out by counsel for special attention, *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir. 1980), the district judge need not consider evidence produced at a hearing almost two years prior to the court's ruling on the summary judgment motions where the hearing was not transcribed and made part of the record until after the court ruled and a notice of appeal was filed. Given our conclusion that testimony at the preliminary injunction hearing in this case was not part of the record properly before the district court in ruling on the summary judg-

ment motions, we do not consider this testimony in deciding whether the district court erred in granting summary judgment for appellee.

In ruling on the merits of a motion for summary judgment, the district court must consider all evidence in the record, and summary judgment is proper only if *"everything* in the record ... demonstrates that no genuine issue of material fact exists." *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir.1986) (quoting *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir.1980)) (original emphasis). In reviewing whether Chevron has met its burden of proving that no genuine issue of material fact exists as to a valid ground for termination under the PMPA,[11] we resolve credibility questions and draw permissible inferences in favor of the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Applying this standard, we conclude that summary judgment for Chevron was proper. As stated previously, Chevron alleged five grounds for termination of the Jobber Agreement. The district court granted summary judgment for Chevron on two of the grounds. First, the court held that Clinkscales's failure to cure monetary defaults in the form of returned checks was a "failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled." 15 U.S.C. § 2802(c)(8). Second, the court concluded that Clinkscales's acts of supplying non-Chevron gasoline to branded Chevron dealers constituted "willful adulteration, mislabeling or misbranding of motor fuels." 15 U.S.C. § 2802(c)(10). These two grounds for termination are not only prohibited by the Jobber Agreement itself,[12] but are also in-

11. Clinkscales does not appeal the district court's denial of its motion for summary judgment. Rather, Clinkscales contends only that genuine disputes of material fact as to each of the alleged grounds for termination made summary judgment for Chevron premature. Accordingly, we do not reach the question of whether the court erred in denying Clinkscales's motion for summary judgment.

12. The parties stipulated that the Jobber Agreement between Clinkscales and Chevron is a "franchise" as defined in 15 U.S.C. §§ 2801(1)(A)(i) and (1)(B)(ii) and that their relationship was a "franchise relationship" as defined in 15 U.S.C. § 2801(2). In addition, Clinkscales does not dispute that Chevron's no-

cluded in the list of the exemplary "event[s] which [are] relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable," as described in 15 U.S.C. §§ 2802(b)(2)(C) and 2802(c).[13] Chevron needed to prove the occurrence of only one of the grounds for termination under the PMPA to be entitled to summary judgment.

Chevron met its burden of proof for summary judgment because Clinkscale's failure to cure his monetary default provided a sufficient basis for the termination of the Jobber Agreement under the PMPA. The parties stipulated that on or about June 5, 1984, "three checks drawn on Clinkscales's bank and tendered as payment of his account with Chevron were dishonored." Only one of the checks was replaced prior to October 3, 1984, which left an outstanding debt of $57,879.71. Additionally, neither party disputes that Chevron's notice of termination complied with the notice requirements of the PMPA, 15 U.S.C. § 2804. By a letter that was hand-delivered on June 27, 1985, and which included all of the information required by 15 U.S.C. § 2804, Chevron informed Clinkscales that the Jobber Agreement would terminate 90 days after receipt of the letter unless Clinkscales paid Chevron the full amount due within 10 days. This undisputed evidence indicates that Clinkscales was in default on its account with Chevron, thereby giving Chevron the option of terminating the agreement pursuant to the terms of the Jobber Agreement and under the PMPA. *See Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1217 (7th Cir.) (district court properly refused to enjoin termination of franchise where franchisee was in "financial distress" and had failed to cure dishonored checks), *cert. denied*, 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984); *Shell Oil Co. v. Kozub*, 574 F.Supp. 114 (N.D.Ohio 1983) (granting summary judgment to fran-

chisor where franchisee had used his bank cards to avoid paying for gasoline for many months after he had obtained and sold it, thereby failing to pay in a timely manner sums lawfully due).

Clinkscales contends, however, that disputed issues of fact remain as to the amounts allegedly due to Chevron, and thus that summary judgment was improper. He first argues that because he denied receiving a letter which Chevron mailed to him on June 6, 1984, informing him that he was in default, the trial court erred by finding that notification and demand for repayment were made to him by the June 6 letter. The evidence upon which Clinkscales's argument rests, however, was not part of the record before the district court when the summary judgment order was entered. At the time of the order, the only evidence relating to the June 6 letter was the affidavit of L.L. Reed attesting that Chevron gave Clinkscales notice of default by letter dated June 6, 1984. As no evidence properly before the district court at the time it issued its order supported Clinkscales's allegation that he did not receive Chevron's notice, this finding was proper.

Moreover, the issue of whether or not Clinkscales received the June 6 letter is irrelevant to Chevron's entitlement to summary judgment. Clinkscales does not and cannot contend that his failure to receive the June 6 letter places Chevron in noncompliance with the notice requirements of the PMPA; to the contrary, the parties do not dispute that the notice provided by Chevron's June 27 letter complied with 15 U.S.C. § 2804. Furthermore, by his own admission Clinkscales discussed his default with Chevron officials prior to June 27. Clinkscales claims to have had several telephone conversations with L.L. Reed before June 27 on the issue of the bad checks. Additionally, Chevron's June 27 letter states that in accordance with directions it had

tice of franchise termination complied with the PMPA.

**13.** This phrase is defined in a non-exhaustive list of twelve such "events" in section 102(c) of the PMPA. 15 U.S.C. § 2802(c).

received from Clinkscales, Chevron would apply payments made by Clinkscales to his more recent purchases of gasoline,[14] with the result that he remained in default because of his failure to make good his three bad checks for his gasoline purchases on May 7, 8, and 9. Clinkscales quite evidently was on notice of his default prior to June 27, and the possibility that he did not receive Chevron's letter of June 6 does nothing to defeat Chevron's entitlement to summary judgment, which is based solely on Clinkscales's failure to cure his properly noticed monetary default.

Clinkscales secondly argues that summary judgment for Chevron was improper because, in accordance with an arrangement between Clinkscales and Chevron credit manager L.L. Reed, Chevron granted Clinkscales a "reasonable time" in which to cure his indebtedness.[15] Clinkscales attests that Reed gave him the time he reasonably needed to make good the checks, and cites as supporting evidence two notes handwritten by Reed, one of which indicates that Reed asked Clinkscales "to pay at least *one*" of the checks (emphasis in original).[16] Clinkscales argues that he complied with this credit arrangement by sending one check to Chevron on or around June 26.[17] Accordingly, Clinkscales contends that he was not in default when the June 27 termination notice was issued, but rather was acting in compliance with the temporary credit extension.

Clinkscakes's argument fails, however, for even assuming that Chevron did agree to grant him a "reasonable" amount of time to make good the checks, there is no evidence to show that Chevron acted unreasonably, in violation of the alleged agreement, in its handling of Clinkscales's debt. To the contrary, the evidence indicates that Clinkscales had several discussions with Chevron officials throughout the month of June in which they discussed Clinkscales's bad checks and in which Chevron did nothing more than encourage Clinkscales to pay his debt. The district court correctly found that the handwritten notes "do not reasonably indicate any 'agreement' between plaintiff and defendant to delay the paying off of the bad checks." Moreover, even if the alleged agreement had existed, as de-

**14.** Clinkscales wanted his payments to go to the more recent purchases of motor fuel so that he would be able to receive a "prompt payment discount" of one percent off the purchase price. This discount was available only if payment for motor fuel purchases was made within ten days of delivery of the fuel.

**15.** Clinkscales produced evidence indicating that Chevron's credit managers were given authority to grant extensions of credit to franchisees. The following provision appeared in Chevron's Credit Manager's Guide:

*Granting Extensions.* A flexibility is needed in the application of our credit terms if we are to obtain maximum sales and the best of relationships with our customers. It must be recognized that all of our customers cannot always pay their accounts promptly. Circumstances necessitating an extension, and the responsibility of the customer for further credit, will be such that continuation of credit deliveries beyond the terms of sale will be justified in some instances.

When sound judgment indicates that it would be good business to grant an extension, it should be definitely understood with the customer that we are making a temporary exception to our credit terms in granting him additional time within which to pay his account, or in continuing credit deliveries after his account has become past due. Such an understanding is important to avoid the development of a permanent past-due 30 or 60–day paying habit. At the same time a definite understanding should be reached with the customer as to when he will make payment.

When an extension is granted, it should be given in a friendly and pleasant manner so that the customer feels that we are interested in him and want to help him. Good will and friendship can more frequently be won or lost by the manner in which an extension is given than by the decision to grant the extension.

**16.** Although the notes were part of Chevron employee J. Garber's desk file, the parties seem not to dispute that they were written by L.L. Reed. The note quoted above was not dated, although it presumably was written sometime before the second note, dated June 25, which states:

Talked to Junior, told him I had to know something today. Gave him the amounts of each check and total discount—He said he was doing federal tax and would call me back at four.

Clinkscales's son did not return the call to Reed at 4:00 that day.

**17.** Chevron apparently did not receive this check prior to issuing the termination notice.

scribed by Clinkscales it was sufficiently open-ended and amorphous that Chevron could reasonably have terminated it—with the June 27 letter—after Clinkscales failed to return Reed's call on June 25th.[18]

Clinkscales is also in error in alleging that the district court should have made an independent determination of the reasonableness of Chevron's termination of the Jobber Agreement. By its very terms, the PMPA provides that "failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled"[19] is "an event which is relevant to the franchise relationship and *as a result of which termination of the franchise ... is reasonable....*"[20] Section 102(c) of the PMPA, 15 U.S.C. § 2802(c), provides twelve situations in which Congress has decided that termination of a franchise agreement is reasonable. Rather, it is when the franchisor bases termination on a ground not specifically provided for in the PMPA that "the courts may undertake careful scrutiny of nonenumerated events to determine whether they also constitute events 'as a result of which termination or nonrenewal is reasonable.'" *Cantrell v. Exxon Co.,* 574 F.Supp. 313, 316 (M.D.Tenn.1983) (citing *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1219 (7th Cir.1982); *Lyons v. Mobil Oil Corp.,* 526 F.Supp. 961, 965 (D.Conn.1981); S.Rep. No. 95–731, 95th Cong., 2d Sess. 38, *reprinted in* 1978 U.S. Code Cong. & Admin.News at 896).

## IV.  CONCLUSION

We therefore AFFIRM both the district court's denial of appellant's motion for leave to file a surrebuttal brief and the entry of summary judgment for appellee on the PMPA claim.[21]

---

18.  *See supra* note 16.

19.  15 U.S.C. § 2802(c)(8). The question of what constitutes payment "in a timely manner," however, is "intended to permit evaluation of nonpayment or late payments in view of prevailing commercial or industry trade practices." S.Rep. No. 95–731, at 38, 1978 U.S. Code Cong. & Admin.News at 896. Clinkscale's evidence alleging that it complied with credit arrangements made with Chevron's credit manager is insufficient to create a genuine issue of fact in this regard. The fact that Chevron had been willing in the past to work with Clinkscales to cure arrearages and other violations of the Jobber Agreement does not preclude Chevron from exercising its right to terminate based on this failure to pay sums due. We recognize that in some instances, "repeated acceptance of late payments over a period of years would suggest that timely payment was not its prevailing trade practice." *Sun Refining & Marketing Co. v. Rago,* 741 F.2d 670, 674 (3d Cir.1984). The history of the relationship between these parties, however, does not persuade us that Chevron misled Clinkscales into thinking that his failure to make good his checks would be tolerated indefinitely. Moreover, although the time limitations of the PMPA are intended:

to preclude a franchisor from basing termination upon 'old and long-forgotten events' ... the legislative history [also] notes that the time limitations are not intended to stop a franchisor from exercising termination or nonrenewal rights based upon a future event which constitutes a ground for termination or nonrenewal, even if such future event is a repeat occurrence of an event with respect to which the previous exercise of termination or nonrenewal rights was waived.

*Walters v. Chevron U.S.A., Inc.,* 476 F.Supp. 353, 357 (N.D.Ga.), *aff'd,* 615 F.2d 1135 (5th Cir. 1979) (citing S.Rep. No. 95–731, 95th Cong., 2d Sess. 33, *reprinted in* 1978 U.S.Code Cong. & Admin. News at 892).

20.  15 U.S.C. § 2802(b)(2)(C).

21.  Because we affirm the grant of summary judgment on the basis of Clinkscales's failure to cure his monetary default, and because proof of only one ground for termination under the PMPA is sufficient for summary judgment, we need not address the district court's second holding under the PMPA, that Clinkscales misbranded Chevron fuel.